EWIG, Administratrix, Appellant, vs. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Respondent.

*April 8—July 8, 1918.*

*Master and servant: Injury to railway employee while leaving yards: Federal liability act: Questions for jury: When employment ceased: Usual and permitted way for going from work: Crossing tracks: Negligence of employer: Failure to keep lookout on backing engine: Contributory negligence: Assumption of risk: Cause of accident: Conjecture.*

1. In leaving the railway yard when his work is done a railway employee is but discharging a duty of his employment and in a legal sense is at work as an employee of the company, provided he is so leaving by the proper and usual way or at least by a

way known to and expressly or tacitly permitted by the employer. So *held* in an action for the death of an engineer, where the parties stipulated that if he was an employee of the defendant at the time of the accident the action was governed by the federal liability act.

2. At the end of his run an engineer turned his engine over to the engine dispatcher and then rode upon it to the roundhouse yard in accordance with his custom, which was not disapproved by the railway company. Before leaving the engine he made out his work report and time slip, cleaned up, and changed his clothes. Sometime later he was found, fatally injured, twisted around the brake-beam of the tender of another engine which had been backing through the yard at a place where employees frequently crossed the tracks in going to and from their work. Upon the evidence, which showed no active objection by the company to such use of the tracks, it is *held* to have been a jury question whether this was a usual and tacitly permitted way to enter and leave the roundhouse yard.

3. The mere fact that the accident did not occur until about an hour after his engine reached the roundhouse yard would not justify a holding, as matter of law, that the deceased had stopped to visit or had turned aside from his duty, it not being shown how long he was occupied as stated on the engine and it appearing that his work report, which apparently he had delivered to the proper employees in the yard, showed that a brake valve needed to be cleaned out, so that he may well have stopped to talk or give suggestions to the roundhouse foreman about that.

4. Although as the other engine was backing through the yard the bell was ringing, the speed moderate, and the method of handling the engine by an engineer alone was the customary method used in the yard, yet, it appearing that the engine was a very large one, with a high tender piled full of coal, and there being evidence tending to show that, for several minutes before the engine started and while it was running 800 feet to the place where it was when the accident was discovered, the engineer had not looked at the south side of the track—the direction from which deceased probably came—except as he was able, sitting as he was, to see it at a distance of 140 feet back of the engine, and that the whole portion of the yard through which the engine was backing was commonly used by employees and others, apparently with the knowledge of and without objection by the company, it is *held* that the question whether there was actionable negligence in failing to keep a proper lookout was one for the jury.

5. Under the federal employers' liability act contributory negligence does not defeat the action, but simply requires that the proportion of such negligence be ascertained and the damages diminished to that extent.
6. Assumption of risk still remains a defense under the federal act, but it does not include risk of unexpected negligent acts of co-employees.
7. In this case the cause of the accident cannot be said to be necessarily mere conjecture, there being evidence tending to show that deceased was struck by the backing engine at a point where there was much travel to and fro and where he would very naturally be crossing the track in leaving the yard.

APPEAL from a judgment of the circuit court for Milwaukee county: JOHN J. GREGORY, Circuit Judge. *Reversed.*

The action is to recover damages for the death of John Ewig, a locomotive engineer in the employ of the defendant company, which occurred December 23, 1914, in the roundhouse yard of the company at Milwaukee. A verdict for the defendant was directed at the close of the trial, and from the judgment entered thereon the plaintiff appeals.

It was stipulated at the trial that if Ewig was an employee of the defendant at the time of the accident, then the action should be tried under the federal liability act. The facts were not greatly in dispute and were in substance as follows: John Ewig, the deceased, was a passenger engineer employed for many years by the defendant, residing at Elkhart Lake, Wisconsin, and for about eight months prior to his decease having a run from that point to Milwaukee every day, leaving Elkhart at 7:20 a. m., arriving in the Milwaukee Union depot at 9:15, and returning at 4:15 p. m., reaching Elkhart at 6:35 p. m. After his engine was cut off from the train in the Milwaukee station his duty was to take it to the south track, look it over or inspect it, and then turn it over to the engine dispatcher, who took charge of it and ran it out to the roundhouse yards of the company, three miles and a half west of the depot and very near Merrill Park station. His duty was also to make out a work report stating the con-

dition of the engine and any repairs necessary and a time slip showing the time of the run and the number of hours of work claimed. The work report was for the information of the roundhouse foreman and the time slip for the chief time-keeper, both of whom were at the roundhouse yard. The engineer could deliver these memoranda to the engine dispatcher, or he could, if he chose, remain on the engine, ride out to the yard, and deliver them to the proper employees himself. It appears that Ewig had a brother living on Twenty-eighth street north of and some blocks from the roundhouse yard, and was accustomed to ride out on the engine to the yard and go over to his brother's house for dinner and then come back to the yard in the afternoon and ride down to the station on his engine with the engine dispatcher. This custom was not disapproved by the company. It seems that when he rode to the yard he frequently delivered the time slip and work report himself. He was accustomed also to change his clothes in the engine on the way out to the yard and he kept his clothes and towels in the seat box of the engine. On the day of the accident he came in to the Milwaukee station with his engine at 9:40 a. m., put it on the side-track, inspected it, and turned it over to engine dispatcher Vollmer, who took it out to the roundhouse yard. Ewig remained on the engine, made out his work report and time slip, and changed his clothes, but did not give either the report or the slip to Vollmer. Vollmer placed the engine over the cinder pit, near and east of the roundhouse, and left it there with Ewig still in the cab washing his face. Vollmer had received a call to take another engine to the station. No witness testified to having seen Ewig after Vollmer left him up to the time of the accident, which was somewhere near an hour later. Vollmer went to the roundhouse, looked the engine over which he was to take, got the turntable in position, backed out onto the turntable, turned the engine head to the west, and backed up to the water tank to take on water.

The yard extends in a general easterly and westerly direction south of and along the main tracks from Thirty-first street to Fortieth street and is full of tracks. The roundhouse is well toward the west end of the yard, the cinder pit 50 or 100 feet east of it, and the water tank above referred to just north of the cinder pit. The track on which Vollmer took out the second engine runs between the cinder pit and water tank and is at first some 300 feet south of the main track with the intervening space full of tracks. It runs easterly, gradually approaching the main track, and merges in it 1,200 feet or more from the tank and just east of Merrill Park station. Thirty-third street runs north and south and terminates at about this point. Thirty-sixth street terminates north of the water tank, and at this latter point is an elevated viaduct for foot passengers, crossing the network of tracks north of the water tank, but not crossing the track on which Vollmer's engine was standing. After reaching the tank Vollmer got down from the cab, looked over the engine, saw there was nothing wrong with it, then got back on the engine, put in fourteen or fifteen shovels of coal, got up on the window seat on the right-hand (i. e. the north) side, started the bell ringing, and started the engine backward. As he moved eastward he looked in that direction from the window of the cab, but in that position a man approaching the track from the south could not be seen on account of the height of the tender, and a man on the south rail would be hidden from view for a distance of 140 feet from the engine, and a man in the center of the track for a distance of 94 feet. The engine backed at the rate of four or five miles an hour for a distance of about 800 feet to a point opposite the coal shed, where Vollmer stopped to get a box of tools or supplies, and the boy who handed the box up told him that there was a man under the tank. Help was gotten and Ewig was found still alive, twisted around the brake-beam of the tender under the trucks nearest the engine. He was gotten out, but died shortly

afterwards without making any statement of the facts of the accident. Marks in the snow indicated that he had been dragged from a point about 350 feet east of the water tank.

For the appellant there was a brief by *William L. Tibbs* of Milwaukee, *Joseph Martin* of Green Bay, and *Willis E. Lang* of Milwaukee, attorneys, and *Daniel W. Sullivan* of Milwaukee, of counsel, and oral argument by *Mr. Tibbs.*

For the respondent there was a brief signed by *C. H. Van Alstine* and *H. J. Killilea* of Milwaukee, and oral argument by *Mr. Killilea.*

The following opinion was filed April 30, 1918:

WINSLOW, C. J.    The stipulation that this case is governed by the federal liability law if, at the time of the accident, the deceased was at work as an employee of the defendant, renders it necessary to consider but four questions, viz.: (1) Was there evidence tending to show that the deceased was in a legal sense at work as an employee of the company at the time of the accident? (2) Was there any evidence of actionable negligence on the part of the defendant or its employees? (3) Did the deceased, as matter of law, assume the risk? (4) Was the cause of the accident mere conjecture? These questions will be discussed in their order as stated.

1. It is now quite well settled by federal decisions that "in leaving the carrier's yard at the close of his day's work" the employee is but discharging a duty of his employment, and that, if he was employed in interstate commerce while actually at work, he was, in legal contemplation, so engaged while leaving the yard when the actual work was ended. *Erie R. Co. v. Winfield,* 244 U. S. 170, 37 Sup. Ct. 556. Our own decisions are in harmony with this principle. *Ewald v. C. & N. W. R. Co.* 70 Wis. 420, 36 N. W. 12, 591; *Kunza v. C. & N. W. R. Co.* 140 Wis. 440, 123 N. W. 403. Of course the employee must be leaving by the proper and

usual way or at least by a way known to and expressly or tacitly permitted by the employer.

We think that there was sufficient evidence in the present case to take this question to the jury. The evidence is plenary that engineers were permitted, at the end of their run, to ride out to the roundhouse yard with the engine dispatcher if they chose, and it is clearly proven that such was the almost uniform practice of the deceased. There is much testimony also to the effect that employees used the entire space from the water tank (where the engine started) to the coal sheds (opposite which the body of the deceased was discovered) in going back and forth to and from their work. This space was a network of tracks, and the engine dispatcher, Vollmer, says: "Men or employees frequently cross the track down even with the coal sheds going towards town, and we have to be careful to avoid accidents, as those men sometimes pass in front of the engines." Again Vollmer says, after stating that he found some footprints in the snow coming from the west to a point about 350 feet east of the water tank, where the marks of some person being dragged in the snow began: "I don't know whether those footprints . . . were of Mr. Ewig or not, but that is the short cut through there from the shanties [*i. e.* the locker and bulletin shanties] towards the Merrill Park depot; that is the customary way." There is no evidence in the case of any active objection on the part of the defendant to this use of the tracks, and hence there was sufficient evidence to take to the jury the question, whether this was a usual and tacitly permitted way to enter and leave the roundhouse yard. The argument is made that so long a time elapsed between the arrival of Ewig's engine at the cinder pit and the accident that it must be held that Ewig had stopped at the roundhouse to visit or for other purposes of his own and hence could not be held to be in service, even though leaving the grounds in a usual way. We do not think we can so hold as a matter of law. Ewig's

engine reached the Union station in Milwaukee at 9:40 o'clock. When it reached the roundhouse yard does not appear, but naturally it could hardly have reached there until some time after 10. When Vollmer left it Ewig was washing his face. Vollmer went to the roundhouse, looked over his second engine, turned the turntable, backed out, ran onto the turntable and from there onto the tank track, and thinks he got to the tank at about 11:15, probably an hour after leaving Ewig. The accident was a few minutes afterward. We do not see how a court would be justified in saying that Ewig must have stopped to visit or that he had turned aside from his duty. No one knows how long it may have taken him to wash and clean up. Apparently he delivered his work report and time slip to the proper employees at the shanties just south of the cinder pit. The work report, which is in evidence, shows that the engine brake valve was reported as needing to be cleaned out. It may well be that he stopped to talk with or give suggestions to the roundhouse foreman about this. There is absolutely no affirmative evidence to show that he was visiting or idling away his time, and we do not think that the length of time which elapsed necessarily proves the fact.

2. Was there proof tending to show actionable negligence on the part of the defendant? On this question it is urged by respondent that the uncontradicted proof shows that the engine bell was ringing, the speed moderate, and the method of handling the engine, namely, by an engineer alone with no fireman, the customary method used in the yard, and hence that no negligence can be found in these respects. This may be at once admitted, but there is one ground of negligence claimed by appellant which is not thus foreclosed, namely, the failure to keep a proper lookout. It appears that the engine was a very large one, with a high tender piled full of coal, and that when the engineer sat in the window seat on the right hand (in this case the north side)

he could not see the center of the track in the direction in which he was moving for a distance of 94 feet and could not see the south rail for a distance of 140 feet. It goes without saying that he could not see a man approaching the track from the south for a much greater distance. By Vollmer's own testimony (and this testimony is the only testimony on the subject) it appears that after looking over his engine at the water tank he got back on the engine, put in fourteen or fifteen shovels of coal, got up on the window seat, started the bell ringing, and then started the engine. His testimony justifies the conclusion that he paid no attention to the south side of the engine or to the region south of the track, from the time he got into the engine after looking it over. How long a time elapsed between the looking over of the engine and the starting of it does not appear, but it must have been several minutes. The jury might well conclude that for a number of minutes before the engine started and during the whole 800 feet from the water tank to the coal shed the engineer never looked at the south side of the track except so far as he was able to see it at a distance of 140 feet east of his engine when sitting on his window seat on the north side. It might perhaps be that, if this territory through which he was backing was a territory not generally used by employees in passing back and forth, negligence could not be predicated on failure to take an observation on the south side of the engine just before starting and at least occasionally thereafter; but this was a case where the evidence tended to show that the whole territory through which the engine was running was commonly used by employees of the company and others, apparently to the knowledge of and without objection by the defendant. Under these circumstances we reach the conclusion that the question whether there was negligence by Vollmer in failing to keep a proper lookout on the south side of the engine before starting and during the trip was properly a question for the jury.

There was, of course, ample evidence to justify a finding that Ewig was guilty of contributory negligence, but contributory negligence does not defeat the action under the federal law, but simply requires that the proportion of such negligence be ascertained and the damages diminished to that extent. See act as printed in *Second Employers' Liability Cases,* 223 U. S. 1, 6, 32 Sup. Ct. 169.

3. Upon the question of assumption of risk little need be said. It is true that assumption of risk still remains a defense under the federal act, but, as has been said by this court, that does not include risk of unexpected negligent acts of co-employees. *Graber v. D., S. S. & A. R. Co.* 159 Wis. 414, 150 N. W. 489. Under the evidence in this case there was room for the conclusion that the failure of Vollmer to keep a lookout on the south side was such a negligent act.

4. We cannot say that the cause of the accident is necessarily mere conjecture. The evidence tends to show that the deceased was struck by the engine at a point where there was much travel to and fro and where he would very naturally be crossing the track on his way to his brother's house on Twenty-eighth street. We intimate no opinion as to the fact, but simply hold that a verdict to that effect could not be said to have no evidence in its support.

*By the Court.*—Judgment reversed, and action remanded for a new trial.

The respondent moved for a rehearing, and the following opinion was filed July 8, 1918:

Per Curiam. Upon respondent's motion for a rehearing attention is called to the case of *Jacoby v. C., M. & St. P. R. Co.* 165 Wis. 610, 161 N. W. 751, 164 N. W. 88, in which it was held as matter of law that a railroad employee leaving his master's premises after completing his duties was not engaged in interstate commerce, and it is claimed that the doctrine there laid down should be applied to this case.

Whether it would make any difference with the result is unnecessary to be considered. Upon the trial the parties agreed that, if the deceased was an employee at the time of the accident, the action was governed by the federal liability act, and the case was tried on that basis. By taking this position it is clear that the respondent effectually waived the objection that the case was governed by the state law and consented that it be tried as a case governed by the federal law. It was entirely competent for the respondent to do this. *Leora v. M., St. P. & S. S. M. R. Co.* 156 Wis. 386, 146 N. W. 520. It is not now necessary to consider what will be the effect should this concession not be made upon the next trial of the action.

Motion denied, with $25 costs.