## PENNSYLVANIA RAILROAD COMPANY *v.* ELVA MAE REELEY

[No. 5, October Term, 1940.]

36

*Decided December 18th, 1940.*

The cause was argued before BOND, C. J., PARKE, SLOAN, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*Edward E. Hargest, Jr.,* and *O. Bowie Duckett, Jr.,* for the appellant.

*Avrum K. Rifman,* with whom was *Isaac Lobe Straus* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The first question on this record is the motion to dismiss the appeal upon the ground that the appellant failed to have the bills of exceptions filed within the time limited by law. The judgment in this case was rendered on January 11th, 1940, and the appeal entered on the following January 22nd. The record was received in this court on April 12th, 1940, which is within the statutory period of three months allowed. Code 1939, art. 5,

sec. 6. The trial of the instant case was had in the Superior Court of Baltimore City, and the procedure for the preparation and signing of the bills of exceptions is to be found in the Code Pub. Loc. Laws (1930), art. 4, title "Baltimore City," sec. 316; Charter of Baltimore City (1938), sec. 411, pp. 304, 305.

By the provisions of the statute mentioned, the bills of exceptions might have been signed at any time within the period that any of the parties had "the right to file an appeal from the rendition of the verdict by the jury or the findings of the court upon the issue of fact in the cause." Upon the filing of the order for appeal, the time for the signing is automatically extended until twenty days before the period within which it is required by the statute that the record shall be transmitted to the Court of Appeals, provided (1) that the party appealing or his counsel shall submit the bills of exceptions to the appellee, or his counsel, not less than thirty-five days prior to the time that the record must be filed in the Court of Appeals, for the purpose of amendment or additions to the bills of exceptions, and (2) that the appellee or his counsel, within ten days after said bills of exceptions shall have been submitted to him, shall return said bills of exceptions to the appellant or his counsel with such amendments or additions as he may desire, and (3) if this should not be done, the bills of exceptions shall be signed by the court as originally prepared by the appellant or his counsel. (4) If the appellee or his counsel should return the bills of exceptions to the appellant or his counsel, with his amendments or additions, as hereinbefore stated, the bills of exceptions with such amendments or additions shall forthwith be presented to the judge before whom the case was tried, who shall settle the same within five days thereafter.

There is no controversy that there has not been a literal compliance with the terms of this statute. Nor is there any disagreement in respect of the focal dates. The record had to be transmitted to the appellate court on or before April 22nd, 1940. It was filed ten days

earlier, on April 12th. The time for signing the bills of exceptions was, therefore, April 2nd, provided the appellant or his counsel had submitted the bills of exceptions to the appellee or his counsel not later than on or before March 18th. The bills of exceptions were not submitted to the appellee or her counsel until March 26th, which was eight days in default. A literal compliance with the provisions of the statute was, therefore, obviously impossible. The appellee was thereupon put to her election whether to accept or to refuse the submission. She chose to accept and thereby became estopped to raise the point of the appellant's delay. Her choice carried all its necessary and obvious implications. When the appellee made this election, it was with the knowledge that the delay of eight days had caused it to become impossible for the appellant to have the bills of exceptions signed within the successive periods of time allotted by the terms of the statute.

The submission and acceptance on March 26th by the appellee of the bills of exceptions for the purpose of amendments or additions, and the necessity for their return to the appellant or its counsel, with such amendments or additions as may be desired, by the appellee, within ten days thereafter would, if the appellee should take the full allowance of ten days, extend the time for their return to April 5th, which is three days beyond the date when the bills of exceptions should have been signed, and which, moreover, excluded the five days assigned for the judge before whom the case was tried to consider and settle the proposed amendments or additions to the bills of exceptions. The appellee had no power to lessen the period of five days assigned by the statute to the court. She, consequently, realized that the only way the bills of exceptions could be signed within the statutory period prescribed was by the voluntary shortening by her of the period of ten days for revision, and returning the bills of exceptions, with the proposed amendments and additions desired, on or before March 28th. Instead of employing the only means of having the bills of ex-

ceptions signed in time, the appellee consumed the full period of ten days and returned the bills of exceptions with the desired changes on April 5th. The appellee asserts that the full period of ten days was required because of the many modifications and additions to the bills of exceptions as prepared by the appellant. The appellee, however, had the original bills of exceptions when the election was made, and, so, was then aware of their content. It follows that by her election the appellee surrendered the consequences of the appellant's initial delay when cognizant of the full effect of her act. In reliance on this election and the appellee's conduct in forthwith accepting, examining, correcting, and re-stating the bills of exceptions, the appellant did not apply for any extension of time for the submission and the signing of the bills of exceptions until after the time for this had elapsed. *United Rys. & Electric Co. v. Dean,* 117 Md. 686, 704, 705, 84 A. 75.

On April 6th, the appellant filed its petition wherein it is stated that the bills of exceptions with amendments and additions were not returned until April 5th, hence it was impossible for the bills of exceptions to be signed within the period named by the statute. The petition prayed for an order granting an additional period of ten days for the submission to counsel and the signing by the court of the bills of exceptions. An answer was filed by the appellee which took the position that the provisions of the statute were mandatory and, therefore, the court could not grant an extension nor sign the bills of exceptions. The petition contained matters in explanation and extenuation of the delay, and the answer denied them. Testimony was taken before the court, and the court was moved to pass an order on April 10th as of March 17th, extending the time for submission of bills of exceptions to appellee's counsel to March 28th, and the time for signing the bills of exceptions to April 12th. On April 10th, the court formally approved the bills of exceptions on this record. The appellee reserved an exception to the signing of the order and of the bills of exceptions.

In the view taken by this court, it is not necessary to analyze and comment on the testimony offered by the parties. It was sufficient to convince the judge at *nisi prius* that the action taken was required. The indisputable record of the course of the procedure establishes the election of the appellee to disregard the initial provision of the statute as to the time for the filing of the bills of exceptions, and to proceed as if there had been no delay. After this election the appellee revised the bills of exceptions by modifications, change and additions and meanwhile retained the draft submitted by the appellant. Such independent and distinct conduct and effort were only reconcilable with the conclusion that the appellee had abandoned the objection to the signing of the bills of exceptions on the ground of the patent delay. The appellant was justified in this belief, and the appellee cannot now repudiate her election to the prejudice of the appellant, which had relied and acted upon her indicated choice. It is true that when the appellee returned on April 5th, the submitted bills of exceptions, along with the new draft of the bills which the appellee had prepared, she advised the appellant for the first time that an objection would be made to the signing of the bills by the court for the reason that the bills of exceptions had not been submitted until March 26th. This delay in so advising the appellant effectually prevented the appellant from having the bills of exceptions filed within the time prescribed. Having chosen one alternative, the appellee may not, under the circumstances stated, later pursue the other alternative, to the detriment of the appellant whose subsequent actions were governed by the belief that the appellee was accepting the bills of exceptions as having been timely submitted. *Bower on Estoppel by Representation,* sec. 249, pp. 233-241; *Wright v. Bagnell and Sons, Ltd.,* [1900], 2 Q. B. 240, 244 C. A.

The argument advanced in refutation of this doctrine is that it does not apply because the periods of time fixed in the statute are not directory but mandatory. The statute deals with a matter of practice which is not easily

accommodated to rigid regulation. A certain degree of adaptation according to exigent circumstances best comports with procedural restrictions. When the statutory interlocking schedule of time for the successive stages of the preparation, submission, alteration, correction and amendment, and, finally, of the approval by the judge of the bills of exceptions, is apprehended and considered, it is plain that the subject matter of the legislation does not indicate that the provisions are such that any deviation in the times prescribed will render the bills of exceptions illegal and void, as would be the result if the provisions of the statute were intended to be mandatory. *Bond v. Baltimore*, 118 Md. 159, 166, 84 A. 258. The statute was designed to provide for the prompt, accurate and adequate framing of bills of exceptions. There is no provision which declares the result of a failure to comply with the exact timing set forth. The mode is clearly more important than the limitation of time.

The terms of the statute afford decisive evidence that the provisions are not mandatory but directory. For instance, one of the provisions is that, should the appellee or his counsel fail to return the submitted bills of exceptions within ten days of their submission to him, the bills of exceptions shall be signed by the court as originally prepared by the appellant or his counsel. Such a direction is clearly not mandatory. If it were, the court would have to sign the bills of exceptions as thus presented, notwithstanding the bills of exceptions as drawn were framed in clear violation of the provisions of article 5, section 12, of the Code, with respect to the preparation of bills of exceptions and the imposition upon the court of the duty to require the exceptions to be prepared as prescribed by section 12. Another provision of the local statute is that the bills of exceptions, after a compliance with the statute by appellant and appellee, "shall forthwith be presented to the judge before whom the said case was tried, who shall settle the same within five days thereafter." Again, this provision is directory and not mandatory or it would be in conflict with article

5, section 13 of the Code, which provides for the allowance and signing of bills of exceptions by another judge if the one before whom the cause was heard is unable to do so by reason of the expiration of his term of office, or death, sickness or other disability. *State v. Phillinger,* 142 Md. 365, 369, 120 A. 878. In *Wegefarth v. Weissner,* 132 Md., 595, at page 602, 106 A. 854, 857, the court said, in reference to like statutory provisions: "To hold that they are mandatory would require the court to sign the bills of exceptions nothwithstanding they were not properly prepared by the appellant, or might deprive the appellant of the benefit of his exceptions, or of his right of appeal, because of his inability to present the bills of exceptions to the judge, who may be sick or absent, or because of the inability of the judge, by reason of sickness or pressing engagements, to sign them within the five days." These and other reasons which might be stated have contributed to the conclusion, which is stated in the former decisions of this court, that the provisions of the particular statute now at bar are directory and not mandatory. *Christian v. Johnson Construction Co.,* 161 Md. 87, 101, 155 A. 181; *Baltimore Paint & Color Works v. Automobile Electric & Parts Co.,* 173 Md. 210, 216, 195 A. 558; *United States Fidelity & Guaranty Co. v. Williams,* 148 Md. 289, 297, 129 A. 660; *Stiegler v. Eureka Life Ins. Co.,* 146 Md. 629, 657-659, 127 A. 397; *Wegefarth v. Weissner,* 132 Md. 595, 598-604, 106 A. 854; *In re Ingoglia's Petition,* 161 Md. 207, 155 A. 305.

The decisions cited differ one from another and from the cause at bar, in respect to some facts, but unequivocally determine that the provisions of the statute here under consideration are directory. While not identical, the facts of the cases cited are so analogous to those on the record of the pending appeal as to make these cases conclusively in point. The terms of the statute in question are designed to effect method, system, and uniformity in time with reference to bills of exceptions. The non-compliance here invoked does not deprive the appellee of any right. The times severally designated may, with im-

punity, be modified by consent of the parties, or from necessity by the court, since such a departure relates to what is here incidental to the legislative aim and purpose and is not in defeat or evasion of its essential objective. In other words, since the statute at bar is directory, its provisions are not imperative, but are to be reasonably enforced. So, where the act or thing is performed, but not in the time or in the precise mode indicated, it will be sufficient if what is done accomplishes the substantial purposes of the statute. Thus the court may for good cause shown modify the times within which prescribed acts may be done.

These general principles are exemplified in the decisions with regard to the preparation and signing of bills of exceptions. The rules of court and the statutes passed in their regulation have varied and, necessarily, their construction discloses a corresponding variety. A general rule which is deducible from the decisions is that, if the parties consent, the bills of exceptions may be prepared and signed after the expiration of the period specified. *Supra;* and 2 *Poe, Pl. & Pr.*, sec. 319, p. 290; *Buffington v. Davis*, 33 Md. 511, 512; *Horn v. Buck*, 48 Md. 358, 366-369; *Gwynn Oak Park v. Becker*, 177 Md. 528, 531, 532, 10 A. 2nd 625. The consent may be found in agreement, in waiver, or implied in an estoppel. *Supra.*

In the present case the appellee's consent is based on estoppel, as established by the facts and circumstances found on the record and referred to in this opinion. For the reasons here stated the motion to dismiss must be denied.

2. The important question in this case is whether the dead man, George A. Reeley, was engaged at the time of his death in interstate commerce. There is no controversy that he was then a servant of the Pennsylvania Railroad Company, a corporation whose business is the interstate and intrastate carriage of freight and passengers for hire, and that while working as a freight brakeman in its service and in the course of his employment he was accidentally killed on the evening of November 21st, 1937.

A claim for compensation was filed with the State Industrial Accident Commission of Maryland on the theory that at the time of the happening of the accident the servant was engaged in intrastate commerce. The employer defended on the ground that the servant was doing interstate work. The hearing resulted in a rejection of the claim, as the Commission held it had no jurisdiction because the dead man was performing work in interstate commerce. On the appeal to the Superior Court of Baltimore City and a trial before a jury on issues whether the decedent was doing intrastate work at the time of his death, the jury found that he was and the decision of the Commission was reversed. The trial court rejected the employer's prayers, which were in denial of compensation on the theory that there was no legally sufficient evidence for the jury to find that the dead man was engaged in intrastate commerce when the accident happened. The correctness of this ruling is at bar for determination.

The testimony which must be taken to be established is to the following effect: On the morning of November 21st, 1937, a freight train left Harrisburg, Pennsylvania. It was made up of sixty-three freight cars of the hopper gondola type, which were loaded with ore. The train was drawn by a railroad locomotive, No. 6733, with tender. The train was completed by the cabin car or caboose at the end. The destination of the train was Canton Piers, Baltimore, Maryland, where every one of the carloads of ore was billed for delivery. A conductor, named Thomas W. Hudson, engineman, Charles Lambie, fireman, Clifford E. Morgan, flagman, D. W. Arnold, and the brakeman, George A. Reeley, who was killed, comprised the crew. While on the way, in Pennsylvania, one of the cars had to be let out for repairs, but all the other sixty-two, with the same engine and caboose, continued on the way to Baltimore. The crew remained with the train throughout the run. Reeley acted as the front brakeman.

The first station or yard on the route of the freight train into Baltimore is Bay View; then, at a distance of about one mile, is the Highland Yard, and next, one-half of a mile further on, is Canton. From the Canton Yards to the ore pier at Canton is approximately a mile. The freight train arrived at Bay View at ten minutes after four in the afternoon and moved to the Highland Yard, where the conductor received an order to take the train to the head of the Canton Yard in order to cut the freight engine loose from the train, as, because of its size, it was physically impossible for the freight engine to go down to the ore pier at Canton, and it was necessary to replace the large freight engine with the yard engine in order to move the train from the yard at Canton to the ore pier.

This was the customary operation. To carry out the instructions, the caboose or cabin car at the end of the train was cut loose at the spur track at the Highland Yard and left there, while engineman Lambie, fireman Morgan and brakeman Reeley proceeded with the freight engine and train of loaded cars to Canton; and there cut the engine loose from the train, so, that, with the freight engine removed and out of the way, the yard engine, with its own crew in charge of its management, could be moved to the head of the train of standing freight cars and be coupled to these cars in order to draw them from the Canton Yards to the ore piers at Canton, which was where the ore was consigned. After the yard engine was coupled to the train and freight cars, the crew of the freight train had no further connection with the subsequent moving of the train to the Canton ore piers.

In the described operation by the three members of the train crew, brakeman Reeley was in charge and he remained in charge to bring the loosed freight engine back from the Canton Yard to the Highland Yard, and there couple the freight engine to the cabin car or caboose, which had been left there for that purpose, so that it and the crew might be taken back to the Bay View Yard by the freight engine and the caboose or cabin car placed on the cab track of that yard. After this was done, the

engineman and fireman ran the locomotive from Bay View to the ash pit at Orangeville and, the conductor and the flagman, without brakeman Reeley, who was missing, went to the yardmaster's office and reported by telephone to the official at Orangeville who had charge of the discharge of crews. When this was done at half past six in the evening, the crew's tour of duty was ended with reference to the operation of the freight train from Harrisburg, Pennsylvania, to piers at Canton, Maryland.

It is not known by direct testimony how it happened that Reeley was accidentally killed after dusk on that day. When the engine and its tender began to run backward on the return from the Canton Yard to the Highland Yard to couple with the cabin car which had been left on the spur track, Reeley was seen riding on the back step of the tender. When the engine and tender arrived at the Highland Yard, the waiting trainmen with the cabin car did not observe him on the engine or tender, and he was missed when the engine, tender, and cabin car stopped at Bay View. The conductor notified the proper officials not to let any run be made over the track on which the engine had come, and a search for Reeley was begun. His body was discovered about 233 feet south of where the cabin car had been left on the spur track, and about where the freight engine and tender had backed across the southward main track on their way to pick up the cabin car and the rest of the train crew. From scattered articles and marks found it was indicated that he had fallen under the backing engine between 45 and 50 feet south of where his body was lying.

On the facts of this record, and the rational inferences of which they are susceptible, there is no issue of fact for the jury. It is established without contradiction in testimony or by permitted inference that the dead brakeman was an employee of the railway company at the time of his death, and that he accidentally was killed by an injury which arose out of his employment, and which was inflicted in its course. Neither is there any question of the manner in which the railway operations

were conducted, nor of what acts and in what capacity the dead man acted. It is furthermore conceded that, until the freight engine and tender were cut off at the Canton Yards, the brakeman was engaged in interstate transportation. Nevertheless, the contention was successfully made in the trial of the issues that, after this removal of the freight engine, the brakeman was engaged in intrastate transportation during which his fatal accident happened. The basic ground on which this position is taken is that when the cabin car, and the engine and tender, with the crew, were separated from the train of loaded cars, which were then drawn by the yard engine to the piers for ore at Canton, the terminal point of the interstate shipment, the subsequent movement of the detached equipment, in the operative charge of the crew, was no longer connected with the interstate haul and no longer a part of it. The fallacy of this reasoning lies in the exclusion of important and determinative factors whose existence is factually undisputed.

The shipment of the ore was not complete until its arrival at the piers at the Canton terminal. It was an element in this carriage and delivery by railway from Harrisburg to the waterside in Baltimore, that the traction of the train of loaded freight cars through Pennsylvania and Maryland would not be completed by its freight engine on account of its large size, which would prevent it from going to the piers; and that, after pulling the train to the Canton Yards, the freight engine and tender would necessarily leave the line of freight cars in the Canton Yards which, however, was not the end of the interstate shipment. The delivery had to be made by the replacement of the freight engine by a yard engine and its crew, so that the train of cars could be hauled a mile to their destination, and, so accomplish the interstate movement of the ore. It follows that the interstate transportation could not have been effected except through the combined and related movements of the two engines and their crews.

On consideration it is obvious that every operation of the crew of the freight train after the yard engine was coupled to the line of freight cars was caused by their interstate transportation and in direct and proximate relation to it. The carrier conducts its business on the rigid lines of tracks and the movement of its rolling stock is necessarily so limited. Within these physical restrictions, with the aid of switches, sidings, spur tracks and crossovers, the indicated substitution of motive power had to be made. So, in the direct course of this interstate shipment, it was the work of the crew to get the yard engine at the head of the line of freight cars when the freight engine could not further be used. To make this railway operation the cabin car was dropped off on a spur track, with a complement of the crew. The railroad tracks to the south of where the cabin car was left run north and south. The freight engine, with the freight cars in draft, proceeded in a southerly direction over the two parallel main tracks of the railway onto a third parallel track leading into the Canton Yards. When the freight engine had moved the train of cars into the Canton Yards, the freight tender was uncoupled and the freight engine moved to a siding, and the yard engine came in and hauled the freight cars towards the piers. The freight engine and tender held their position until the yard engine drew the freight cars by. When they had passed and cleared the track, so that the freight engine could move out, and run backward in reverse direction over the tracks, the engine and train had come to where the cabin car had been left standing on the spur track. It was in this movement of the engine and tender that the brakeman fell and was killed.

The temporary stoppage of the interstate shipment of the ore in order to change engines was simply a handling or operation while in transit and in the ordinary course of such an interstate movement, and was not an alteration of the nature of the shipment. *Western Oil Refining Co. v. Lipscomb,* 244 U. S. 346, 349, 37 S. Ct. 623, 61 L. Ed. 1181; *Carson Petroleum Co. v. Vial,* 279

U. S. 95, 103, 49 S. Ct. 292, 73 L. Ed. 626; *Roberts, Federal Liability of Carriers,* (2nd Ed.) secs.

Hence, what was necessary to be done in effecting this substitution of engines was done in the course of the interstate transportation of the commodity. Nor was the journey of the crew in charge of the engine and tender and cabin car brought to an end at the intended destination point, when the yard engine was connected with the train of freight cars. No new and independent use in any form of transportation would be begun until their return in charge of the crew to the yards at Bay View for the crew's report and receipt of orders and thus end the trip. Until then the crew was on duty and in continuous compensated service in connection with this particular interstate shipment. *Anderson v. Director General,* 94 N. J. L. 421, 110 A. 829. Again, the withdrawal of the freight engine and tender from the head of the Canton Yards and the taking of the cabin car from where it had been left on the spur track, which was open at both ends, were operative necessities which were incident to the interstate transportation of the ore, and had to be completed by the freight engine before its return to its base or station for use in any other railway operation. Thus the run back of the freight engine in charge of the original crew is as fundamentally a participation in the interstate transportation of the ore as was this crew's going to the train of cars for the beginning of the haul at Harrisburg. The whole movement was to facilitate the passage of the commodity in interstate transportation, and necessary to make practicable its continuous carriage for delivery at the place to which it was consigned. No matter how regarded, what the brakeman and his fellows of the crew did after the return from the Canton Yards began, and while it was in progress, was, until after the accident, in direct and proximate relation to the interstate transportation. What the trainmen were doing when the injury occurred was in causative and immediate sequence with the problem in interstate transportation which made necessary the mode of rail-

way operation adopted. Thus the service in which the brakeman had been and was employed at the time was primarily in the forwarding of interstate commerce, and the mode of this connected service at the time of the accident was a reasonable incident or contingency of the completeness of the service. The view here stated is supported in principle by text and precedents. See 2 *Roberts, Federal Liabilities of Carriers,* (2nd Ed.) sec. 745; *Bover v. Pennsylvania R. Co.,* 162 Md. 328, 339, 159 A. 909; *Chicago & Eastern Illinois R. Co. v. Industrial Commission of Illinois,* 284 U. S. 296, 52 S. Ct. 151, 76 L. Ed. 304; *Thomas v. Pennsylvania R. Co.,* 162 Md. 509, 518, 519, 160 A. 793; *Nashville, C. & St. L. R. Co. v. Banks,* 156 Ky. 609, 161 S. W. 554; *Chesapeake & Ohio R. Co. v. Kornhoff,* 167 Ky. 353, 180 S. W. 523; *Callahan v. Boston & M. R. R.,* 79 N. H. 173, 106 A. 37; *Southern Pac. Co. v. Stephens, Tex. Civ. App.,* 201 S. W. 1076; *Wabash R. Co. v. Whitcomb,* 94 Ind. App. 190, 154 N. E. 885; *Ewig v. Chicago etc., R. Co.,* 167 Wis. 597, 167 N. W. 442, 169 N. W. 429; *McDonald v. Pittsburgh etc. R. Co.,* 279 Pa. 26, 123 A. 591; *Patterson v. Pennsylvania R. Co.,* 284 Pa. 577, 131 A. 484; *O'Donnell v. Director General,* 273 Pa. 375, 117 A. 82; *Laughlin v. Missouri, Pac. R. Co.,* 297 Mo. 345, 248 S. W. 949; *Richter v. Chicago etc., R. Co.,* 176 Wis. 188, 186 N. W. 616; *Pipal v. Grand Trunk Western R. Co.,* 341 Ill. 320, 173 N. E. 372; *Erie Railroad Co. v. Winfield,* 244 U. S. 170, 173, 37 S. Ct. 556, 61 L. Ed. 1057, 1065; *New York Cent. R. Co. v. Marcone,* 281 U. S. 345, 350, 50 S. Ct. 294, 74 L. Ed. 892, 896. See *North Caroline R. Co. v. Zachary,* 232 U. S. 248, 260, 34 S. Ct. 305, 58 L. Ed. 591, 596; *Baltimore & O. R. Co. v. Whitacre,* 124 Md. 411, 427, 92 A. 1060; *Garber v. Missouri Pac. R. Co.,* Mo. Sup. 210 S. W. 377.

The evidence in this case is in agreement on all the material facts, and the finding of the State Industrial Accident Commission is in accordance with these facts. The primary question on the appeal is, therefore, one of law, as this evidence is that at the time of the injury

52

the dead brakeman was engaged in work so closely related to interstate transportation as to be practically a part of it. It follows there was error in refusing the employer's first or demurrer prayer. The remedy afforded by the Federal Employers' Liability Act, 45 U. S. Code Ann. sec. 51 *et seq.*, is paramount and exclusive. *Thomas v. Pennsylvania R. Co.*, 162 Md. 509, 511, 518, 519, 160 A. 793; *Hines v. Baechtel,* 137 Md. 513, 515, 113 A. 126; *New York Central etc. Co. v. Tonsellito,* 244 U. S. 360 361, 362, 37 S. Ct. 620, 61 L. Ed. 1194, 1197, 1198; *New York Cent. R. Co. v. Porter,* 249 U. S. 168, 169, 39 S. Ct. 188, 63 L. Ed. 536, 537; *Lindgren v. United States,* 281 U. S. 38, 46, 50 S. Ct. 207, 74 L. Ed. 686, 692, 693; *Delong v. Maine Cent. R. Co.*, 136 Me. 194, 6 A. 2nd 320; *Dunkell v. Pennsylvania R. Co.,* 106 Pa. Super. 356, 163 A. 70; *Graber v. Duluth, S. S. & A. R. Co.,* 159 Wis. 414, 150 N. W. 489.

*Motion to dismiss appeal denied, and judgment reversed, without a new trial, with costs to the appellant.*