Franklin D. ISGETT, Executor of the Estate of John F. Isgett, Plaintiff,

v.

SEABOARD COAST LINE RAILROAD COMPANY, Defendant.

Civ. A. No. 70–315.

United States District Court, D. South Carolina, Florence Division.

Heard April 19, 1971.

Decided Aug. 31, 1971.

As Amended Sept. 7, 1971.

Ellis I. Kahn, of Solomon, Solomon & Kahn, Charleston, S. C., James P. Mozingo, III, Darlington, S. C., for plaintiff.

Hugh L. Willcox, of Willcox, Hardee, Houck, Palmer & O'Farrell, Florence, S. C., for defendant.

HEMPHILL, District Judge.

John F. Isgett, deceased, originally commenced this action for injuries, pain, suffering, etc., allegedly resulting from the negligence of defendant in failing to provide Isgett a safe place to work. The case is prosecuted under provisions of the Federal Employers' Liability Act.[1] After the death of original plaintiff on December 6, 1970, his son, by consent, was substituted as fiduciary plaintiff under provisions of Section 10–209[2] South Carolina Code of Law, Annotated, 1962, as amended. Included as a part of the negligence relied on for recovery was malpractice[3] or dereliction of duty.[4] It is admitted that the immediate cause of original plaintiff's death was coronary and not negligence of defendant.

Defendant's answer admits the employment of the late plaintiff, admits knowledge of his diabetic condition, and admits that he was examined by a com-

---

1. 45 U.S.C. § 51 in part provides:

    Every common carrier by railroad while engaging in commerce between any of the several States or Territories * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce * * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment. * * *

2. Section 10–209, S.C.Code, Anno., 1962 provides:

    Causes of action for and in respect to any and all injuries and trespasses to and upon real estate and any and all injuries to the person or to personal property shall survive both to and against the personal or real representative, as the case may be, of a deceased person and the legal representative of an insolvent person or a defunct or insolvent corporation, any law or rule to the contrary notwithstanding.

3. When the case came on for trial by the court defendant's counsel protested surprise at this but the pretrial notes show awareness of the issue.

4. Pargaraph VIII of the complaint alleges:

    The severe injury and loss to the plaintiff directly resulted from the negligence, failures, violations, and omissions of the defendant in that the defendant failed to provide the plaintiff a safe place to work under all the circumstances appearing; defendant compelled the plaintiff to wear so-called "safety shoes" which it knew, or should have known, with the knowledge defendant had of plaintiff's physical condition, that this was dangerous to the plaintiff; defendant allowed the plaintiff to return to work without giving any warnings of the dangers involved or making any limitation on his activities, when it knew of his physical condition; and defendant was otherwise derelict in not using due care.

pany physician May 2, 1967 and certified as being able to return to work. As an affirmative defense defendant pleads Isgett's own negligence in failing to use any care or caution for his own well-being, failing to do anything to prevent further foot trouble, and failing to advise defendant he had trouble with his feet.[5]

After hearing the testimony, and reviewing same as transcribed by the Official Reporter, rereading the depositions, and examining the exhibits, this court, in accordance with Rule 52(a)[6], Federal Rules of Civil Procedure, upon the credible evidence revealed by and extracted from the record before it publishes its

### FINDINGS OF FACT

1. The late John F. Isgett began employment with the predecessor of the defendant corporation in approximately 1945 as an oiler or helper. He was laid off from this employment in 1949 or 1950 for approximately six to eight months, was later re-employed. At the time he was re-employed, physical examinations were made by physicians under employment and supervision of the railroad, and it was determined or discovered at that time that he was suffering from diabetes mellitus. This man, who had minimal education, was put to work as a car man. From time to time thereafter, over the years, Isgett received other physical examinations at the hands of railroad medical examiners, and it is admitted that the railroad knew and these examinations continued to reveal that he was suffering from diabetes mellitus.

2. On December 16, 1966, Isgett was admitted to Saunders Memorial Hospital in Florence, South Carolina by his private physician, Frank B. Lee, M. D., with a diagnosis of "diabetic arteriosclerosis, right leg, with circulatory insufficiency." The physical examination of his legs at that time revealed: (1) atrophic skin right foot, (2) no pulses right foot, and (3) right foot cool. He was discharged from the hospital on January 5, 1967. At that time he was taking 50 units of insulin daily. There was an ulcer on the bottom of his right foot which was not

---

5. As to this last specification of negligence, defendant's doctor at first refused him a certificate because of an unhealed sore on his foot. As to other allegations of contributory negligence, it is generally accepted in railroad and legal circles that such does not bar recovery but may be considered on the question of diminution of damages. Congress has specifically so provided in 45 U.S.C. § 53 which reads:

In all actions hereafter brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, that no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.

6. Fed.R.Civ.P. 52(a) provides:

In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the ground of its action. Requests for findings are not necessary for purposes of review. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b).

healed. Isgett was seen and treated by Doctor Lee for several months. There was minimum improvement, the prognosis was considered "fair", but Doctor Lee found him able to return to work 7 March 1966.

3. On March 9th, Isgett applied to return to work with the defendant railroad but he was turned down under directions from the Chief Surgeon because the wound had not healed. He had been examined by E. M. Allen, Jr., M. D., a physician employed and retained by the defendant railroad for purposes of making physical examinations of the railroad's employees and prospective employees. Doctor Allen acknowledged that he knew Isgett's condition, and that he had treated him as a private patient for a number of years for diabetes, high blood pressure and concomitant problems. The doctor noted that he observed a "necrotic ulcer right foot, probably diabetic." He doubted that he had checked the pulses in his legs. The doctor, to whom Isgett had been sent by the defendant to determine "whether he was able to go to work or not", found that he was not able to return to work at that time.

4. Doctor Allen rejected him again on April 20, 1967.[7] When he presented himself for the examination he had a letter from Doctor Lee which concluded that "I believe that Mr. Isgett is now able to return to work." Doctor Allen testified:

Well, the railroad requires that their representative okay a man who has been operated on to make sure that he is thoroughly recovered before they will permit him to come back to work. So he came by my office for me to inspect his incision. That was on April 20, 1967. I did not check him for diabetes. He was another doctor's patient. He was in good hands. I just looked at his incision and it hadn't completely healed. I suggested to Mr. Isgett that he wait a

few more days before he returned to work. He came back on May 1. I reexamined the site of operation, his incision, and it had finished healing and I okayed him to return to work.

Q. Sir, would you read for the court for our benefit the April note that you have with regard to Mr. Isgett. Just sort of quote exactly from your notes.

A. The April note?

Q. Yes, sir.

A. I can read it. "April 20, 1967. Patient worked last day December 18, '66. Dr. Frank Lee removed stone bruise on right foot at Saunders Hospital. Has not healed. Also treated by Dr. Suber who is a foot specialist." Podiatrist, I believe it is. "Wants to return to work at the ACL. Tried to return in March, and was refused permission." (R. 16).

5. On May 1, 1967 John F. Isgett returned to Doctor Allen's office. Inquiry directed toward the physician revealed:

Q. Did you have occasion to examine him again, sir?

A. May 1. He came back again.

Q. What do your notes say with regard to that examination?

A. "Area of surgery has healed with scar tissue remaining. It is my opinion that he is okay for work." Now, that applied only to the surgery. I did no other examination.

Q. You didn't check his leg pulses?

A. I just checked his site of operation.

Q. Let me ask you this, sir: If the man had come in with one of his arms in a cast, would you have approved him to go back to work, and just simply looked at the site of that other injury?

A. Well, that is all I was asked to do as to whether he had healed. His personal physician had okayed him for work, and they asked me to check the site of sur-

7. Although Doctor Allen mentioned "April 20th" several times, it appears that this examination and rejection was done on April 27th. For present purposes the difference is of no significance.

gery to see if the operation had healed. That is all I was asked.

Q. Who asked you to do that?

A. I guess the Coast Line. They require that he come by to get a Med 4. That is a form that okays for work. Asking had he recovered from surgery, and he hadn't, and a few days later he had completed healing. That is all that I was asked to do.

Q. Isn't it your function as an examining physician for the railroad to determine if he is fit to go back to work, or any employee is fit to go back to work?

A. That is a hard question to answer. I wouldn't know how to answer that.

Q. Just answer it as best you can.

A. Well, the best I can, if hypothetical Dr. Jones' patient comes to me, Dr. Jones says that the patient has recovered from pneumonia, and he has a slip from Dr. Jones, then I just see whether he has recovered from pneumonia. I don't just do a routine physical examination on him.

Q. Would you listen to his chest?

A. If I were checking on pneumonia, yes. But if the man was sent to me with a statement from his attending physician saying that he was able to go back to work and the railroad asked me to check the site of surgery that is all I would do.

Q. But you wouldn't feel the legs to see if they were cool or look at the legs?

A. Well, I didn't.

Q. You were aware of the type work generally that a car man does in terms of being on his feet a lot, and heavy work. Is that correct?

A. Yes.

Q. Do you give him any instructions with regard to limitation on what he should do in his work?

A. Well, I rejected him because he hadn't completed healing. He had almost healed, but he was still not quite. When he came back his incision had completely healed, and I okayed him for the work that a car man is required to do.

Q. You gave him no instructions that you recollect?

A. No instructions that I recollect. I have no record of giving him any instructions.

Q. Let me ask you this: Can physical stress and more specifically the type of work this man had to do, aggravate circulatory problems of diabetes?

A. In my opinion you—you are talking about this case?

Q. Yes sir.

A. Well, I hate to—I will just have to guess at it.

THE COURT: If you don't know, admit you don't know.

THE WITNESS: I don't know. I am doing the best I can.

THE COURT: We lawyers admit we don't know sometimes.

THE WITNESS: Well, it would be my opinion that if the man's foot had healed and if he has mild diabetes which I assume that he had, he had back when I treated him, maybe it got worse, but if he had mild diabetes, and if his operation had healed, I would think he would be able to do what a car man does.

Q. Indulge me one moment. A couple of more questions, and I will be through. Was it of any significance to you, sir, in passing on this ulcer that he had on his leg the fact that he had been out of work from December until the first of May solely because an ulcer had not healed as a result of a diabetes considering this in terms of whether or not he had severe diabetes or severe complications of the disorder?

A. No. I agree with you fully on that thought, but the only thing that concerned me was whether he had recovered or whether he hadn't recovered.

Q. To go back to work?

A. Yes.

Q. One other question and I will be through: Would you tell us the type of foot care that should be given, maintained by diabetics with circulatory problems?

A. Cleanliness. Proper care of the toe nails. Soft socks. Avoid injury.

Q. How about the shoes?

A. Well-fitting shoes that don't rub or pinch.

Q. What about exposure to moisture, heat and cold?

A. I wouldn't think that would play too big a part.

Q. Moisture is not a factor?

A. Cleanliness. If your feet perspire, cleanliness when you come in from work. Bathe them, dry them, powder them.

On cross-examination he continued:

Q. Dr. Allen, a person who has diabetes to the extent that you found Mr. Isgett with would he be better off if he is moving around and causing circulation and his heart to work good rather than laying around in bed? Would he be better off working?

A. Well, I would think that anybody would be better off working. It would be healthier working than laying around in bed if they can work.

Q. Would that tend to promote better circulation in the legs, activity?

A. A moderate mild diabetic controlled by diet and insulin should be able to lead a reasonably normal life.

Q. Does a moderate diabetic who controls it with insulin have the normal life expectancy?

A. No, I wouldn't say that. Diabetes is not a good thing to have.

On re-direct he was questioned further:

Q. (By Mr. Kahn) You brought with you a manual, Doctor, that reflects examinations for people going back to work. Does that have anything about diabetes in it, sir?

A. I believe this manual was subpoenaed.

Q. Yes, sir.

A. Return to Service Examination. "When required, an employee absent from duty due to illness or injury will report to company physician with request for physical examination on Med 1, completed in duplicate by employing office." I don't guess that helps. * *

6. Julius L. Levy, M.D., a general surgeon from New Orleans, who is also an associate professor of surgery at Tulane Medical School, was called by the plaintiff to testify with regard to the question of whether or not the defendant railroad was negligent in its activities concerning the medical examinations given John F. Isgett.

When Doctor Levy was asked if there was a breach of good medical practice he replied:

A. There are several facets to this, and I have spent a lot of time reviewing the record. Primarily, I feel that Mr. Isgett should never have been allowed to return to the type of work that was required in his occupation. I also feel that the examination which Dr. Allen performed on him for the purpose of determining whether or not he should return to work was inadequate, and that had he done a complete examination, or, at least, a complete examination of his legs he would have found things that would have deterred him from sending him back to the type of work he had to do.

Q. Tell us in what respect there was not a good examination, and what he should have done?

A. Well, knowing that diabetes causes progressive circulatory problems, particularly, to the legs, I feel that it was paramount for Dr. Allen to have examined the feet very carefully in order to determine just what circulatory impairment was actually present.

Q. What type of examination?

A. This would include visual examination of the color of the foot. It would consist of feeling the foot for temperature, observing the skin and hair changes on the foot, and a careful palation of the pulses, the presence of which would assure that at least the main arterial supply to the foot was open.

Q. Is there any indicated neurological examination of the feet?

A. Yes. In addition it would have been necessary to have used a pin and to have tested for sensation of pain.

Q. Why is this important?

A. Simply because in diabetics, it is known that this sensation is frequently absent or diminished, and one of the reasons we know that diabetics frequently have foot problems is because of the inability to feel blisters, ulcers, the early changes of pressure.

Dr. Frank B. Lee, a general surgeon practicing in Florence, S. C., one of defendant's expert witnesses, when testifying as to essentials of a proper examination of the health of the legs of a person suffering from diabetes testified:

Q. Would you please describe for us a proper and adequate examination of a man's legs who had had the condition that Mr. John Isgett had, say, during the Spring of 1967. That is, the diabetes, the arteriosclerosis, etc., what sort of examination would you make in order to send him back to work?

A. You added, "In order to send him back to work."

Q. Let's first say just what sort—let's suppose he was retired and doing nothing all day long. What sort of examination would you make?

A. First of all to examine him you would undress him. Take his shoes and socks off and make a general examination. In other words, you couldn't examine a man's legs without examining the man. His weight would have a bearing. His blood pressure would have a bearing. Whether he is a diabetic would have a bearing. Whether he has hardening of the arteries all over the body would have a bearing. Whether he is a bleeder would have a bearing. Everything in his general condition would have a bearing on his legs. When you examine his legs specifically, first of all, you would look at them.

Q. What would you look for?

A. You would look for the condition of the skin. You would feel the temperature of the skin.

Q. Why would the condition of the skin be important?

A. Atrophic skin, a devitalized skin means a lessened amount of blood is getting to the skin of the extremities.

Q. What about coolness? What would be the effect of the temperature, sir?

A. If the leg is cool, you have pretty good reason to believe that a lessened amount of blood is getting to the foot. Now, if the temperature is hot, it means that it is infected. There is a cellulitis there. Usually, there is a redness that goes with that. Some people when they get nervous will have very cold feet and have perfect circulation in the legs. People with good pulse in the legs will sometimes have atrophic skin. To continue with what you look for in examining the legs you check the pulse at different levels. The level of the groin that has one meaning. The pulse back of the knees, that has another meaning.

Q. The level would have relevance to where the occlusion is or is not, is that correct?

A. That is correct. And whether or not ulcers are on the legs, especially, healed ulcers. You might have ulcers on the legs from causes other than arterial ulcers. You might have ulcers on the legs from bad veins or injury.

Q. Would you conduct any sort of neurological examination of the leg?

A. Yes, you test the sensation in the legs.

Q. Would that have been appropriate examination such as you have described for Mr. Isgett in the Spring of 1967? Things that should be done in examining his legs?

A. We always do these things when we examine the legs.

Doctor Levy explained further:

Q. (By Mr. Kahn) Now, doctor, would you tell us how the examination is related to Mr. Isgett losing his leg?

A. It is my opinion that with these changes that we mentioned, the atrophic skin, the coolness of the foot, and the absence of pulsations in the foot that this

—the findings of this constitutes a real threat to this man to returning to any type of active duty. Whether or not he wore safety shoes, being on his feet a lot, particularly, in a damp environment constitutes a breach of good foot care for a diabetic patient. It constitutes something that he shouldn't do, and if he does do is quite likely to have complications. It is my feeling that when Dr. Allen examined him he should have found these things. Not only shouldn't he have returned him to active duty, but had he decided to return him to active duty he should certainly have advised him of what to do in terms of his foot to avoid complications, or his feet. Several things which physicians commonly instruct all diabetic patients with circulatory problems to do: Never to wear new shoes of any sort for prolonged periods of time. Never to get the feet wet. Either powder them or dry them very well. Avoiding any type of minimal trauma which could lead to further problems. It is my feeling that Dr. Allen should have found these changes in the foot, and having decided in my view erroneously to send the man back to work should have certainly instructed him as to what he should or should not do.

Q. Well, how was this related to John Isgett's losing his legs?

A. Well, the predictable happened. Being sent back to that type of work with his severe circulatory impairment, he did sustain trauma to the foot as I understand it, as a consequence of being up and walking with new shoes, be they safety shoes for a prolonged period of time, sustaining blisters which in a normal person would have healed, but in a diabetic with severe circulatory disease did not heal and led to gangrene.

Q. How does dampness contribute to this problem?

A. Moisture and in prolonged contact with the skin actually draws fluid out and macerates the skin.

Q. Does what?

A. Macerates. All of you are familiar with when we immerse our body in water, a swimming pool or anything, how the skin shrivels and puckers. This is caused by the fluid in the skin being drawn out by the water. The medical word is maceration. It causes the tissues of the skin to undergo changes which requires good circulation in order to heal. A diabetic doesn't have this good circulation. The maceration caused by the water continues, gets worse, blisters, and makes a greater demand on the circulation because of infection being present, and the circulation is not able to supply this demand, and, consequently, gangrene sets in.

Q. Would you explain to us the significance of Dr. Allen not giving proper instructions as you have stated them being related to—

MR. WILLCOX: Your Honor, I don't guess it is necessary for me to continue to object to this line of testimony.

THE COURT: No, sir. Your objection goes to the entire line of testimony, and your rights will be reserved.

Q. (By Mr. Kahn) How is the failure to give adequate instructions such as you have described related to Mr. Isgett's losing his legs?

A. Well, had he told Mr. Isgett, or had he sent Mr. Isgett back to other types of duty other than walking and wearing new shoes and this type of thing, had he, for example, sent him to a type of duty where he could drive a truck, and keep his feet dry and clean, this type of thing, I don't feel this would have happened. It might have eventually happened months to years later, but, certainly, not as quickly as it did. Having sent him to full duty and not giving him the instructions, I feel likely this led to this problem. Had he given him proper instructions and had Mr. Isgett followed these instructions again, I feel that they would have maintained his feet for a good bit longer time, possibly, until his death. (R. 55–57)

On cross-examination he was asked by counsel for the defendant railroad:

Q. Now, doctor, if he came to see Dr. Lee in December complaining of a bad

sore on the bottom of his foot, and that sore had healed, would that cause you to feel differently about the exposure in putting him back to work?

A. If I understand your question correctly, Mr. Willcox, are you asking did the ulcer itself prevent him from working or did the circulation problem?

Q. No, sir. I mean if there had been an ulcer in December, and maybe one or two other sores on his feet, and these sores and this ulcer had healed where there wasn't any sores on his feet by May 1, 1967, would that change your opinion in whether or not to permit him to go back to work under those circumstances?

A. No, sir. Diabetes is a progressive thing. The presence of an ulcer on the foot which is slow to heal in a diabetic reflects that he is getting to what we call "instage" or arterial disease. In other words, that the circulation is getting to the point where ulcers are beginning to give problems. Even if this ulcer healed that doesn't change the pre-existing cause for the ulcer and I would feel it is only a matter of time; usually, a very short time before another ulcer is going to form.

Q. Which might be precipitated by most anything?

A. But primarily trauma.

Q. Or without any precipitating cause?

A. Well now, a foot which has poor circulation, but which is in a "heal" state meaning there are no ulcers. I don't feel that ulcers will form de novo, from nothing. It requires some inciting cause such as a penetrating wound, a bruise, a blister, some method by which infection gets under the skin. (R. 60–61)

The defendant railroad presented the testimony of Frank B. Lee, M.D., Isgett's treating physician:

Q. Now, by April 27 of '67 had that ulcer on his foot healed?

A. It had, yes, sir.

Q. Did he have any other trouble with his feet on April 27, '67 or had he recovered?

A. The acute condition had recoverd. The ulcer had healed. You are not asking me about the arteriosclerosis.

Q. I would like to ask you something about that: What was the extent of the arteriosclerosis, or the extent of the lack of circulation in the legs and feet?

A. It was marked in both legs.

Q. Now, would the artery be stopped up or not letting sufficient blood pass through?

A. The answer is both. Some of the arteries are narrowed letting less through, and then in this man's case some of the arteries were completely closed. (R. 146)

Doctor Lee described Isgett's left foot as having cellulitis and a small ulcer, toward the end of May, 1967, when he examined him. Although he had no record reflecting difficulty with the right foot,[8] he did not remember specifically. Doctor Lee did note that the problem with the left foot resulted in the amputation of the left leg seven inches below the knee on July 13, 1967. In terms of "cause," it is not important whether there were blisters on one foot or two, because with the patient laid up with the left leg amputated the gangrene which later developed in the right leg caused it to need amputation. This was precipitated by the dormancy of being laid up with the left leg. Doctor Levy's testimony also inculpated the defendant's negligence with the loss of both legs, e. g. " * * * I feel that they (sic) would have maintained his feet for a good bit longer time, possibly, until his death."

There was considerable testimony elicited about the benefits of continued ac-

---

8. Isgett testified in the pre-trial deposition approximately four months before his death that both feet were blistered from the new safety shoes which he wore for one day toward the end of May.

tivity as far as Mr. Isgett's condition is concerned. The only question with regard to this about which there was a dispute was the degree of activity to be allowed. Finally, Doctor Lee admitted that "there was a danger as compared to a person with healthy legs and a non-diabetic with good circulation in the legs." The danger here was in reference to the heavy manual labor Isgett did in his work as a carman. On re-cross, Doctor Lee was asked:

Q. (By Mr. Kahn) Doctor, Mr. Willcox asked you would it be a good idea to retire somebody in Mr. Isgett's condition, and in effect, you said no. Of course, we agree with that, but what I want to know is this: Would it be appropriate with a man in Mr. Isgett's condition to give him a job, a type of activity that is, perhaps, less vigorous, less heavy from a manual standpoint, * * * ? For example, driving a truck or whatnot.

A. That would be ideal.

7. Fortunately for the record in this case the testimony of John F. Isgett was taken prior to his untimely demise. This court recognizes the difficulty of passing on the issue of credibility on a cold record, such as a deposition, and his testimony, to this trial court, has the ring of truth. He testified as to difficulties and discomfort experienced by him by wearing "safety shoes" as required by his superiors, and the fact that his feet became wet while working (standing and walking) in water accumulated next to the shed at the repair shop, during the last of May, 1967. The testimony does not pinpoint the exact date but the court finds May 27, 1967, to be the most likely date. His feet were blistered but he worked on two or three days before going to a doctor. Other testimony gives credence to his testimony of the working conditions and the fact that his feet hurt. The presence of the water in the railroad yard and around the shed where the late plaintiff was given duty is firmly established by the credible testimony, a condition known to defendant. Isgett was expected to, and did, work in the water. A combination of the water, safety shoes and previous condition caused the blisters on his feet.

8. After his feet were hurt, the original plaintiff returned to Dr. Suber, the podiatrist who had previously treated him but this specialist stated the difficulty was beyond his field. Isgett then called on Dr. Lee, who prescribed a home remedy and rest. No improvement was noted and he was hospitalized and given treatment to which he did not respond. On July 13th one foot was removed. The other foot was removed in October [9]. Ante-dating each amputation was a history of sore and gangrene, a consistent diagnosis of diabetes.

9. The record reveals a sad history of the progress of the disease after the blister-injury and exposure of May 27, 1967. There is no showing but that plaintiff followed the direction of various doctors and submitted to various treatments, hospitalization and surgery. Prior to his initial difficulty of December 1966, when he hurt his foot in some way, he appears to have enjoyed a fairly normal life of mixed work, pleasure and enjoyment despite the presence of the diabetes. After the incident of May 27, 1967, his fortunes, precipitated or triggered by the blisters caused by working in the water in hard shoes, steadily declined. He gradually submitted to the life of an amputee, using a wheel chair for personal mobility, along with artificial legs and crutches, employing an especially geared automobile for transportation. He suffered regular medical bills. When he worked for the railroad he earned approximately $300 every two weeks. At the time of his demise he was drawing $180 monthly retirement. After his amputations he required constant supervision or companionship.

■ 10. Related costs are appropriate for consideration here. Medications

9. Certain color photographs were introduced portraying the late plaintiff after the two amputations.

cost approximately $65.00 per month after May, 1967, until December 1970. The hospital bills directly connected with the amputations and associated treatment totalled $3,501.25. The defendant seeks to avoid this item on the basis that the plaintiff had hospitalization insurance; however, such avoidance is not allowable. See Anno. 13 A.L.R.2d 355; 22 Am.Jur.2d Damages § 210; and Joiner v. Fort, 226 S.C. 249, 84 S.E.2d 719, 722 (1954).

A wheel chair cost $180.00, a special ramp built up to the house cost $35.00, and hand rails cost $20.00. Isgett's out-of-pocket expenses for vocational rehabilitation attempts were $100.00. The widow's sister helped out every day for approximately one year and was paid $35.00 per week, for a total of $1,820.00. Isgett's granddaughter was paid $5.00 per week to help take care of her grandfather. This totals $910.00. Mrs. Isgett needed to buy another car for her husband so that hand controls could be installed and this cost a difference of $700.00 after the old car was traded in. The bill of a podiatrist, Dr. W. J. Suber, was $30.00.[10] Mr. Isgett experienced considerable pain and suffering. His testimony was:

Q. Mr. Isgett, when you take these pills, do you have pains?

A. Yes, sir.

Q. Where do you hurt?

A. Well, my legs.

Q. Even though your legs are off, you still hurt in your legs?

A. Yes, sir, and my toes at times.

Q. Even though your legs are amputated you still have pain in your toes just like they were there?

A. Yes, sir, and I can't sleep.

11. After Isgett had the trouble with his right foot in December of 1966, when a block fell on his foot, a railroad claim agent went to see Isgett and obtained a statement that the company was not responsible. Isgett appears to have signed the statement, although he could not read. This occurred after Isgett had made a claim for sick benefits due to injury. The statement does not reveal any details of the malady suffered, is obviously designed to relieve the railroad from liability and no more. Despite the fact that the claim agent testified that someone else was in the house or came in the house during the colloquy which led to Mr. Isgett's signing, that other person was not asked to be a witness. It appeared on cross-examination that the claim agent prepared the statement before going to the Isgett home.[11]

12. In addition to the physical loss, expense, pain, suffering and incidental costs, the late plaintiff suffered from anxiety frustration and the sure and certain knowledge of his incapacity along with the mental anguish described by his family. From a life of usefulness, enjoyment and acceptance he was transposed to a life of almost complete dependence. The insidious disease that was awakened by his injuries took charge of his physical body with attendant results on his nervous system.

(AND)

## CONCLUSIONS OF LAW

A. This court has jurisdiction of the parties and the subject matter of the action 45 U.S.C. § 51.[12] In fact, the Federal Employers' Liability Act provides plaintiff's exclusive remedy. South Buffalo Ry. Co. v. Ahern (1952), 344 U.S. 367, 73 S.Ct. 340, 97 L.Ed. 395; Louisi-

---

10. Of course, even the reasonable value of services gratuitously performed by a member of the family, such as Mrs. Isgett, may be included but this issue of damages was not pressed.

11. Not significant but noteworthy is the fact that when the deposition of Isgett was taken August 11, 1970, he was not asked about this statement by railroad counsel.

12. In its trial brief defendant asserts: "The defendant admits that the plaintiff's intestate was an employee and admits that the Federal Employees(?) Liability Act, 45 U.S.Code, Section 51, et al, is relevant to the issues in this case.

ana & Arkansas Ry. Co. v. Pratt (CCA 5, 1944), 142 F.2d 847, 153 A.L.R. 851; Penn Ry. Co. v. Reeley (1944), 179 Md. 35, 16 A.2d 904; Graham v. ACL (1954), 240 N.C. 338, 82 S.E.2d 346.

■ B. A railroad's duty to furnish its employees a reasonably safe place to work is nowhere found in the language of the Federal Employers' Liability Act. The duty obtained at common law in employer-employee relationships generally and it is from this source, by judicial decision that the doctrine has become an integral part of the FELA. As with the question of negligence generally, fulfillment or breach of the duty is a federal question to be determined by federal decisions, unfettered by local rules of law. Erie v. Tompkins in all its ramifications has no application.[13]

C. A. C. L. Ry. v. Dixon (CCA 5, 1951), 189 F.2d 525, cert. den. 342 U.S. 830, 72 S.Ct. 54, 96 L.Ed. 628, and related cases [14], outline the test by which the employer's duty is measured.

The Federal Employers' Liability Act does not make the employer an insurer of the safety of its employees while they are on duty. The employer is not held to an absolute responsibility for the reasonably safe condition of the place, tools and appliances, but only to the duty of exercising reasonable care to that end, the degree of care being commensurate with the danger reasonably to be anticipated. Baltimore & O. S. W. R. Co. v. Carroll, 280 U.S. 491, 50 S.Ct. 182, 74 L.Ed. 566. The basis of the employer's liability is its negligence, not the mere fact that the injury occurred. Except as otherwise provided in the Act, liability is determined by common law principles which define negligence as lack of due care in the circumstances, that is, the doing of acts which a reasonably prudent person would not have done, or the failure to do what a reasonably prudent person would have done in the circumstances, or both.

The employer's duty to its employees is to use reasonable care and prudence to the end that the place in which they are required to work, and the appliances with which they work, are reasonably suitable and safe for the purpose, and in the circumstances, in which they are to be used. The test is not whether the tools to be used and the place in which the work is to be performed are absolutely safe, nor whether the employer knew the same to be unsafe, but whether or not the employer has exercised reasonable care and diligence to make them safe.

It is of course the duty of an employee to exercise reasonable and ordinary care for his own safety. If the employee's negligence was the sole proximate cause of his injury, he can not recover. If both employer and employee are guilty of negligence, the employee may recover, but his damages will be diminished in proportion to the amount of negligence attributable to the employee. Louisville & N. R. Co. v. Davis, 6 Cir., 75 F.2d 849; Chesapeake & O. Ry. Co. v. Richardson, 6 Cir., 116 F.2d 860; Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967. Temporary conditions produced by the employee negligently using, or negli-

---

13. From: What is a Safe Place to Work, by A. Paul Funkhouser, General Attorney, Norfolk & Western Ry. Co. in 17 Ohio State Law Journal 356 (1956), citing Choctaw, Oklahoma and Gulf R.R. v. McDade, 191 U.S. 64, 24 S.Ct. 24, 48 L.Ed. 96 (1903); Patton v. Texas and Pacific Ry., 179 U.S. 658, 21 S.Ct. 275, 45 L.Ed. 361 (1901); Union Pacific Ry. v. O'Brien, 161 U.S. 451, 16 S.Ct. 618, 40 L.Ed. 766 (1896), and Bailey v. Central Vermont Ry., Inc., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444 (1943).

14. Payne v. B. & O. Ry. Co. (CCA 6 1962), 309 F.2d 546 cert. den. 374 U.S. 827, 83 S.Ct. 1865, 10 L.Ed.2d 1051; Kimbler v. Pittsburgh & L. E. Ry. Co. (CCA 3 1964), 331 F.2d 383; Hopson v. Texaco, Inc. (CCA 4 1965), 351 F.2d 415, reversed 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740, Steedly v. A. C. L. (CCA 5, 1940), 107 F.2d 754; Buffington v. Owosso Mfg. Co. (CCA 8, 1939), 105 F. 2d 692, and others. See Modern Fed. Practice Digest, Master & Servant ⚖101 (8) and 101(9).

gently failing to use, appliances provided by the employer, are not defects for which the employer is liable. Wood v. Davis, 5 Cir., 290 F. 1. Nor is it actionable negligence that an employer fails to anticipate lack of care on the part of an employee. McGivern v. Northern Pac. Ry. Co., 8 Cir., 132 F.2d 213. [189 F.2d 526]

■ D. An employer, however, must make proper tests and inspections to discover dangers in the places where employees must work and after ascertaining their existence must take reasonable precautions for the safety of employees. Williams v. ACL (CCA 5, 1951), 190 F.2d 744, 748. And the employee has the right to rely on the performance of this duty by the employer and govern his acts accordingly (id).[15] And even if precautions are taken for an employee's safety, the employer cannot escape liability if further precautions were possible and reasonable and were not taken. Boston & M. R. R. v. Meech (CCA 1, 1946), 156 F.2d 109, cert. den. 329 U.S. 763, 67 S.Ct. 124, 91 L.Ed. 658. In the case at bar the court finds credible testimony to the effect that the standing water in which the late plaintiff worked had been the subject of complaints and had been aired at the company's safety meetings.[16] There is an entire absence of testimony that the defendant, after the complaints or the safety meetings took any meaningful precautions (if any had previously been taken) about the standing water. The court concludes as a matter of law that the requiring of performance by employees standing in pools of water is a foreseeable hazard to the safety of the performing employee. Defendant was negligent in failing to provide plaintiff with a safe place to work, particularly with its knowledge of his condition.

E. Perhaps the standing water, of itself, might not have brought on the late plaintiff's difficulty. Combined, however, with other acts directly attributable to defendant, one finds a chain of events which resulted in the injury to the ailing carman. First, it must be assumed he had been a faithful employee, the record so speaks. Second, it is clear he wanted to return to work, for he went back to the railroad doctor again and again to be cleared for duty. One need not refer to the classics to reason that a railroad, an industry of noted declining employment population, is seeking employees who can only perform light jobs —especially for a carman who had previously exhibited no ability for other performance and who could not read and write. He naturally expected to return to usual employment. Third, he goes to the railroad doctor for clearance—not at his insistence but the railroad's. One finds him knocking at the door of his livelihood, so to speak, and the doctor holds his fortunes in his hands. Fourth, the doctor, with a deplorable lack of thoroughness, and with a full knowledge of the man's affliction and the insidious nature of it, sends him back to the physical labor previously engaged in, with no limitation, no suggestion to foremen or other superiors as to his condition, and no recommendation as to lighter work. Fifth, one finds the unwary foreman, who by the very fact that Isgett had been sick should have made some inquiry, if he did not know already, as to the nature of his disability, prescribing hard shoes, definitely a hazard to a diabetic. Sixth, and finally for the purpose of this categorizing, he is put to work in a place made unsafe by accumulated water, about which there had been previous complaints.

15. See also Almendarez v. Atchison, T. & S. F. Ry. Co. (CCA 5 1970), 426 F.2d 1095; Sears v. Sou. Pac. Co. (CCA 9 1963), 313 F.2d 498; Nivens v. St. Louis Southwestern Ry. Co. (CCA 5 1970), 425 F.2d 114; Schilling v. Delaware & H.R. Corp. (CCA 2 1940), 114 F.2d 69; Shiffler v. Penn R. Co. (CCA 3 1949), 176 F.2d 368; Atchison, T. & S. F. Ry. Co. v. Seamas (CCA 9 1953), 201 F.2d 140.

16. Another carman, Woodrow W. Tiller, so testified. Mr. Isgett's son also testified as to the water. The court is not persuaded by defendant's attempts to rebut.

**F.** If an employer undertakes to ascertain whether an employee is physically fit for the job or to diagnose or treat his condition, the employer is liable if he performs such ascertainment in a negligent fashion and injury results. Gunston v. United States (N.D.Cal. 1964), 235 F.Supp. 349, affirmed 9 Cir., 358 F.2d 303. This duty is not peculiar to railroads but applies to all employers. The railroad, realizing the employee (and his superiors) would rely upon the verdict of the examining physician could reasonably be expected to foresee the danger of sending an unfit man to a physical duty. Before this court is a practice, instituted by the employer, of insisting that all employees pass physical inspection and approval. Defendant, through its chosen physician, or foreman, or both, knew or should have known that, because of his diabetic affliction, the late plaintiff was unable to perform hard work, in safety shoes, in water. No one should know better than the railroad doctor the conditions under which the men work, for he is the man who gives them medical clearance for their various tasks. The defendant failed to exercise due care in putting him back to work.[17] There was a non-delegable duty by Dr. Allen to make appropriate inquiry and examinations before certifying Isgett back to work. He deplorably failed. Whether you characterize it negligence or malpractice, he failed to use due diligence. His obvious error or oversight (in examining Isgett) in the professional application of his knowledge, experience and skill, whether due to ignorance or oversight, amounted to malpractice. Ocean Accident & Guarantee Corp., Inc. v. Herzberg's, Inc. (CCA 8 1938), 100 F.2d 171.[18] The testimony unequivocally shows his knowledge of the diabetic condition and his failure to examine in a manner others of his area would have employed. See Jines v. Gen. Elec. Corp. (CCA 9 1962), 303 F.2d 76.

**G.** It may well be argued that railroads, extending their activities over wide geographic areas, are not responsible for climatic conditions.[19] The court accepts the argument, but notes that the conditions here were within the railroad yard. In the confines of a railroad yard the railroad must exercise a degree of care commensurate with the risks to prevent the accumulation of snow, ice, water, and other accumulations of precipitation, in such quantity as to be a menace to the safety of employees working in the yard.[20] The case before the court presents a factual situation which gave rise to a duty on the part of the railroad—to do something about water accumulating in places of usual work in the yard. Defendant ignored or failed in its duty.

**H.** The causal connection is here well established. This court has previ-

---

17. There exists a line of cases holding that it is not plaintiff's burden to prove a case of malpractice against the examining physician. It is sufficient that defendant knew or should have known plaintiff was unable to do the hard work at the time it assigned such tasks and nevertheless ordered him back to work. See Dunn v. Conemaugh & Black Lick Railroad (W.D.Pa.1958), 162 F.Supp. 324, 327, Nuttall v. Reading Co. (CCA 3 1956), 235 F.2d 546, Blair v. B & O R. Co., 323 U.S. 600, 65 S.Ct. 545, 89 L.Ed. 490.

18. See also the Merchants National Bank v. Morriss (CCA 1 1959), 269 F.2d 363, Morgan v. Aetna Casualty & Surety Co. (E.D.La.1960), 185 F.Supp. 20. McHugh v. Audet (M.D.Pa.1947), 72 F. Supp. 394, 399, is authority for the definition: "Malpractice consists of a negligent or unskillful performance by a physician of the duties which are devolved and incumbent upon him on account of his relations with his patients or of a want of proper care and skill in the peformance of a professional act."

19. Raudenbush v. Baltimore & Ohio R.R. Co. (CCA 3 1947), 160 F.2d 363; McGivern v. Northern Pac. R.R. (CCA 8 1942), 132 F.2d 213.

20. See Fort Worth and Denver City R.R. v. Smith (CCA 5 1953), 206 F.2d 667; Anderson v. Elgin, Joliet and Eastern Ry. Co. (CCA 7 1955), 227 F.2d 91; and Detroit, T. & I. R.R. v. Banning (CCA 6 1949), 173 F.2d 752.

ously discussed the various factors directly relating to Isgett's injury. They do not need repeating here.

The Federal Employers' Liability Act expressly refers to a railroad's liability for injuries or death "resulting in whole or in part" from its breach of duty. 45 U.S.C. § 51. Despite the simplicity of the statutory test, the custom of the courts for many years was to speak the abstruse language of proximate causation. See Chesapeake & Ohio R. Co. v. Carnahan, 241 U.S. 241, 36 S.Ct. 594, 60 L.Ed. 979 (1916).

This matter was clarified by the Supreme Court in 1949 in an opinion that rejected the theory that to be the legal cause of an accident for purposes of FELA liability, the alleged cause must be a substantial, as well as an actual, factor in bringing about the death or injury in litigation. The statutory provision was held to provide the test of liability. Coray v. Southern Pac. Co., 335 U.S. 520, 524, 69 S.Ct. 275, 93 L.Ed. 208 (1949). See also Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957) and Gallick v. Baltimore & Ohio R. Co., 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1962). In *Rogers*, supra, the court observed:

> The inquiry in these cases today rarely presents more than the single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit.

Further, the tests of causation under FELA is discussed in detail in 98 A.L.R. 2d 653.

■ I. The late plaintiff was injured due to the negligence of defendant in failing to provide a safe place to work, failing to provide safe conditions under which to perform the work, and assigning a noticeably, known, sick man to a

hard task. There is no evidence of contributory negligence such as to have this court charge a fault against him and deny him full recovery.

J. Plaintiff is entitled to damages. Damages under the Federal Employers' Liability Act are neither proscribed nor defined by 45 U.S.C. § 51, supra. There is no federal common law so that, except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. The Federal Courts have generally applied the state law as to damages. This court acknowledges however, that the question of the proper measure of damages is inseparably connected with the right of action, and in cases arising under this chapter, such question must be settled according to the general principles of law as administered in the Federal Courts. Chesapeake, etc. R. R. Co. v. Kelly, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117 (1916). See also Note 1542 in 45 U.S.C.A. § 51.

■ K. Section 59 of Chapter 2 of Title 45 [21] provides for survival of the original plaintiff's right of action. From the record it is obvious he has a surviving wife and children, which eliminates the showing of dependency. Consistently it has been held that the administrator of a fatally injured employee may recover the beneficiary's pecuniary loss and also for pain and suffering endured between the moment of injury and final dissolution. Capital Trust Co. v. Great Northern Ry. Co. (1916) 127 Minn. 144, 149 N.W. 14; 128 Minn. 537, 150 N.W. 1102, rev. 242 U.S. 144, 37 S.Ct. 41, 61 L.Ed. 208, 210. Of course, plaintiff cannot here recover for the death of the employee but he can recover for deceased's personal loss and expense, pain and suffering.[22]

21. 45 U.S.C.A. § 59 provides: Survival of right of action of person injured

Any right of action given by this chapter to person suffering injury shall survive to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee, and, if none, then of such employee's par-

ents; and, if none, then of the next of kins dependent upon such employee, but in such cases there shall be only one recovery for the same injury.

22. See Notes of Decisions, footnote 12 under 45 U.S.C.A. § 59.

L. The late plaintiff, under the facts of this case, clearly would have been entitled to recover full, fair and reasonable compensation for the loss he sustained by reason of his injuries. Great Northern Railway Co. v. Capital Trust Co. (1916), 242 U.S. 144, 37 S.Ct. 41, 61 L.Ed. 208. The right of action survives to his personal representative.[23] The court measures his entitlement as follows:

(1) Initially, he is entitled to his hospital expense, admittedly Three Thousand Five Hundred One and 25/100 ($3501.25) as an out-of-pocket and personal expense;

(2) Incidental and special to him because of the nature of the injury and its impact on his physique are drug bills (averaging $65 per month for 40 months) in the amount of Twenty-Six Hundred ($2600.00) Dollars, a wheel chair in the amount of One Hundred Eighty ($180.00) Dollars, a special ramp at deceased's home Thirty-Five ($35.00) Dollars, and hand rails Twenty ($20.00) Dollars, out-of-pocket expense for vocational rehabilitation attempts One Hundred ($100.00) Dollars, attendance and supervision care[24] Two Thousand Two Hundred Seventy-Five ($2275.00) Dollars, Seven ($700.00) Hundred Dollars to swap for a car an amputee could drive and Thirty ($30.00) Dollars for a podiatrist, totalling Five Thousand Seven Hundred Forty ($5740.00) Dollars.

(3) This is not the usual case of pain and suffering where death occurs within hours, or a day or week. The late plaintiff suffered the physical agony of the insidious progress of a disease that took one, then both legs, which was triggered and accelerated by his injury. He suffered those agonies attendant to treatment, amputation and recovery. He is entitled to an award of Ten Thousand ($10,000.00) Dollars for pain and suffering.

(4) In addition to his physical pain and suffering he has suffered mental anguish, and anxiety, the shame of being transposed from an able-bodied, self-respecting working man to a pitiable, legless dependent, disfigurement, loss of sex life, humiliation and emotional strains attendant to such a deplorable condition, which would entitle him, if living, to compensation for his loss of happiness, normal life and composure. This court feels it appropriate that the award for the disability per se should include the non-pecuniary, non-pain aspects of the disabled condition, such as deprivation of a normal, full life and a chance to pursue non-economic hobbies or recreation.[25] The court feels that an award of Fifteen Thousand ($15,000.00) Dollars is a fair and adequate amount as compensatory damages therefor.

(5) This court has found that he should not have been put back to work at heavy tasks as he was unable to work in safety because of his condition; under such a finding the court cannot award him the loss of his entire earnings, but can and does award him loss of earnings at light work in the amount of Fifty ($50.00) Dollars per week from June 1, 1967 to December 1, 1970, which the court concludes he lost a total of Nine Thousand ($9,000.00) Dollars. Under the circumstances here a "reduction to present value" would not be appropriate.

(6) Finally, he lost both legs and the abilities attendant to their use, a difficult item, but one for which he is entitled to be compensated for the loss was great, perhaps if he had lived longer the court would be inclined to give a larger award, but, under present conditions, finds an award of Eighteen Thousand ($18,000.00) Dollars to be fair and just.

This court has carefully reviewed and compared such awards as have been reported, and indexed, in comparable cases

---

23. Ibid.

24. Testimony revealed his granddaughter charged $910.00, which the court cut in half and care of his wife's sister in the amount of $1820.

25. See Steeves v. United States (D.C.S.C. 1968), 294 F.Supp. 446; Shebester Inc. v. Ford (Okl.) (1961) 361 P.2d 200; Cronenberg v. United States (E.D.N.C. 1954), 123 F.Supp. 693, 703.

**1144**

involving injury to, or loss of, a leg or legs. Because of the unusual circumstances of this case, particularly the early demise of the deceased, the court thinks the award sufficient. Compare Hubbard v. Long Island R. Co. (E.D. N.Y.1957) 152 F.Supp. 1, Dagnello v. Long Island R. Co. (S.D.N.Y.1960), 193 F.Supp. 552 affirmed (CCA 2), 289 F.2d 797; Lilley v. Simmons (1959), 200 Va. 791, 108 S.E.2d 245, Blanco v. Phoenix Compania de Navegacion (CCA 4 1962), 304 F.2d 13; Delaney v. N. Y. C. R.R. Co. (D.C.N.Y.1946), 68 F.Supp. 70 and cases collected in 11 A.L.R.3rd 9, § 38.

M. The court finds no contributory negligence of such a nature as to justify diminishing the damages awarded.

### CONCLUSION

Defendant is liable to plaintiff in the sum of Sixty-One Thousand, Two Hundred Forty-One and 25/100 ($61,241.25) Dollars. The Clerk will enter judgment accordingly.

And it is so ordered.