Gary Lynn CARLTON, Administrator of
the Estate of Guy Morris Carlton,
Plaintiff-Appellant,

v.

M/G TRANSPORT SERVICES, INC. and
M/V FOREMOST, Defendants-
Appellees.

No. 81-5604.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 5, 1982.

Decided Feb. 2, 1983.

Meredith L. Lawrence (argued), Andrew
M. Stern, Covington, Ky., for plaintiff-ap-
pellant.

W. Scott Miller, Jr. (argued), Miller &
Miller, Louisville, Ky., for defendants-ap-
pellees.

Before EDWARDS, Chief Circuit Judge,
JONES, Circuit Judge and PECK, Senior
Circuit Judge.

PER CURIAM.

Plaintiff in this case is the administrator
of the estate of a deceased seaman who was
chief engineer aboard the M/V Foremost
owned by M/G Transport. After Carlton's
death at night as a result of a heart attack,
the administrator filed his suit under the
Jones Act and it was heard before District
Judge Johnstone and a jury. At the end of
the presentation of evidence, however,
Judge Johnstone granted a directed verdict
on the basis of the following analysis of the
facts as shown in the proofs.

At the time of his death, Guy Morris
Carlton was the Chief Engineer aboard
the M/V Foremost, which was owned and
operated by M/G Transport. Mr. Carlton
had worked for the defendant between
1970 and 1973. He applied to work for
the company again on August 17, 1978.

M/G Transport required each new ap-
plicant for employment to undergo a
physical examination. On the day Carl-
ton last applied for work, the physician
who regularly administered the examina-
tions was unavailable. Under this cir-
cumstance Carlton used his own physi-
cian, Dr. R.W. Bushart, for the examina-
tion. Dr. Bushart performed the exami-
nation and sent his report to the compa-
ny.

Included in the reports and medical
findings was a document signed by Carl-
ton, and witnessed by the doctor, indicat-
ing that he did not suffer from any of the
several diseases or conditions, including
heart disease.

Dr. Bushart completed and signed a form headed "Examiner's Findings." This form indicates the extent of the medical examination and shows that x-rays were taken. There were no comments entered in the spaces left for the physician's remarks. Likewise, the questions "Is the applicant physically and mentally fit for the position applied for?" and the one regarding any symptoms which would require further examination or treatment were unanswered.

Another section of this form, signed by the doctor, is entitled "Past History". Directions on the sheet are in these words: "Symbols [check] Normal Abnormal (underline word) Degrees of abnormality x xx xxx". The words mumps, measles, and hypertension were underlined and a single "x" was placed beside each of these words. Carlton's blood pressure is shown as 170/84. This was the extent of the negative indications on the forms.

The application of employment signed by Carlton asked whether he had had a major illness in the past five years and whether he was then under the care of a physician. Carlton printed the word "No" in response to the inquiries.

Carlton began working for the company on August 18, 1978. The next reference in the proof to his condition shows that he entered the Fulton Hospital on October 10, 1978, from whence he was discharged on October 16, 1978. The hospital records are in the evidence, but there is nothing to show that either Carlton or the Company were aware of its contents.

The hospital records, examined in retrospect, declare that Carlton was treated for "nose bleed; hypertension." Possible abdominal aneurysm was noted on the discharge summary.

After he was discharged from the hospital, Carlton returned to the Foremost for work. He was on duty aboard the vessel from November 1 to December 5, 1978, and again from December 20, 1978 to January 25, 1979. No evidence suggests that Carlton complained of illness or medical problems during these tours of duty.

At about 6:00 A.M. on February 15, 1979, Carlton was called by a representative of the defendants and asked to board the vessel. He agreed and went aboard the Foremost at around 6:00 P.M. on the same day. The only comment shown to have been made by Carlton regarding his physical condition was a remark to a shipmate either that "I haven't been feeling well" or "I don't feel well."

Around 11:30 P.M., Carlton had a conversation with the ship's master in the wheelhouse. They talked of things that had happened on the boat for awhile, then he told the master he was going to bed.

He went to his private room on the vessel, which was equipped with an emergency telephone. The next morning a deck hand opened his door to awaken him and found him dead on the floor. His color had changed and there were no life signs.

The body was removed to a hospital in Paducah. An autopsy was performed. Death was attributed to an acute myocardial infarction resulting from atherosclerotic and thrombotic occlusion of right coronary artery.

Judge Johnstone concluded, "As a matter of law there is no evidence of causal connection between Carlton's death and the breach of any duty owed by the company or the seaworthiness of the vessel."

Our review of this record shows no evidence at all of unseaworthiness under general admiralty law.

█ The Jones Act, of course, is another matter. There the test for submission to the jury is simply whether or not the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. See *Rogers v. Missouri Pacific Railroad Co.,* 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). In this case, a careful review of the evidence presented shows no prior knowledge on the

part of either the deceased or the ship of the condition which actually produced his death during the middle of the night when deceased was retired for the night. On autopsy, death was found to have been due to "an acute myocardial infarction resulting from atherosclerotic and thrombotic occlusion of the right coronary artery." While there were various indications of other sorts of problems which the deceased's health was affected by, no causal connection is shown on this record as to the ship's knowledge of or deceased's doctor's knowledge of the condition which produced his death.

The judges in the majority have, of course, considered the well written dissenting opinion filed by our colleague. We find reasons to agree with it in all respects except for the last two paragraphs.

Although the dissent's negligence argument, based on defendant's failure to read, realize and warn deceased of the inaccuracy of *his* doctor's medical report is slender indeed, it might conceivably pass the "slightest" test of *Rogers.*

We fail, however, to find *any* evidence, as opposed to pure speculation, to meet the requirement of causation.

The judgment of the District Court is affirmed.

NATHANIEL R. JONES, Circuit Judge, dissenting.

This case involves an attack on a grant of directed verdict to the defendants in a wrongful death action under the Jones Act, 46 U.S.C. § 688, and the general maritime law of the United States. The plaintiff alleges that the defendant corporation was negligent in its assumed duty to ascertain the health of the decedent-employee, and that such negligence and failure to provide adequate medical care in light of his condition resulted in his death.

In my view, the majority misconstrues the relaxed standards of proof on liability in Jones Act cases and fails to recognize the nature of the plaintiff's claims. I must therefore dissent.

I

Normally, I would agree with the majority that appellate review of a directed verdict is to determine whether, viewing the evidence most favorably to the party against whom the verdict was granted, reasonable persons could come to but one conclusion. *Coffy v. Multi-County Narcotics Bureau,* 600 F.2d 570 (6th Cir.1979). This case does not, however, present a normal situation. What takes it out of the ordinary is the Jones Act. The Jones Act has a much lower evidentiary threshold for submission of the case to the jury. As a result, even marginal claims should not be foreclosed from jury consideration. *Leonard v. Exxon Corporation,* 581 F.2d 522, 544 (5th Cir.1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 397 (1979); *Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 770 (9th Cir.1981).

The Supreme Court has chastised the lower federal courts for failing to recognize the special nature of the Jones Act cases:

The kind of misconception evidenced in the opinion below, which fails to take into account the special features of this statutory negligence action that make it significantly different from the ordinary common-law negligence action, has required this Court to review a number of cases. In a relatively large percentage of the cases reviewed, the Court has found that lower courts have not given proper scope to this integral part of the congressional scheme.

*Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500, 509, 77 S.Ct. 443, 450, 1 L.Ed.2d 493 (1957). The majority construes the proof standards contrary to the way Congress had intended them to apply to liability under the Jones Act. Most specifically, the majority fails to heed *Rogers's* message concerning the minimal threshold for reaching the jury on issues of negligence and causation.

II

In *Rogers,* the Supreme Court noted that the amendments to the Jones Act have clearly shown Congress's intent to make its remedial scope much larger than normal

tort notions would allow. *Rogers v. Missouri Pacific R. Co.,* 352 U.S. at 507, 77 S.Ct. at 449. The law was enacted because:

> ... the Congress was dissatisfied with the common-law duty of the master to his servant. The statute supplants that duty with the far more drastic duty of paying damages for injury or death at work due in whole or in part to the employer's negligence. The employer is stripped of his common-law defenses .... *The Congress when adopting the law was particularly concerned that the issues whether there was employer fault and whether that fault played any part in the injury or death of the employee should be decided by the jury whenever fair-minded men could reach these conclusions on the evidence.* Originally, judicial administration of the 1980 Act substantially limited the cases in which employees were allowed a jury determination. That was because the courts developed concepts of assumption of risk and of the coverage of the law, which defeated employee claims as a matter of law. *Congress corrected this by the 1939 amendments and removed the fetters which hobbled the full play of the basic congressional intention to leave to the fact-finding function of the jury the decision of the primary question raised in these cases—whether employer fault played any part in the employee's mishap.* Cognizant of the duty to effectuate the intention of the Congress to secure the right to a jury determination, this Court is vigilant to exercise its power of review in any case where it appears that the litigants have been improperly deprived of that determination.

352 U.S. at 507–09, 77 S.Ct. at 449–50 (emphasis added, footnotes omitted).

It is against this background that the grant of directed verdict in this case must be examined.

### III

The defendant contends, and the district court ruled, that the plaintiff has not met the evidentiary threshold for reaching the jury because (1) the defendant company never had knowledge of the decedent's condition and thus could not have been negligent, and (2) there is no evidence to provide a causal link from an act of negligence on their part to the resultant death. The majority finds these arguments persuasive. Because I believe they misconstrue the negligence and causation standards stated in the Jones Act and reiterated in *Rogers,* I cannot agree.

### Negligence

It is clear that the defendant did not have knowledge of the decedent's cardiovascular problems from the report of the August 17, 1978 examination. That report was incomplete. It failed to note what conditions might prevent the decedent from working and failed to answer whether or not he was able to perform his job. In addition, the company does not appear to have received notice of the condition from the hospital reports stemming from the October 1978 hospitalization. Finally, the events surrounding the death appear to indicate that the captain and crew would have little reason to have believed the decedent was in serious trouble.

Yet, knowledge is not the linchpin of the plaintiff's negligence claim. The plaintiff alleges that the company *should* have known. Its failure to know is alleged to be a breach of a duty owed to the plaintiff that gives rise to liability.

This theory has ample support. While it is clear that a company is not required to offer examinations and a precondition of employment, once the company makes it a policy to do so, it must carry out that policy with care and in a non-negligent manner, *Gunston v. United States,* 235 F.Supp. 349 (N.D.Ca.1964); *Isgett v. Seaboard Coast Line R. Co.,* 332 F.Supp. 1127 (D.C.S.C. 1971). The record shows that the company required such examinations. The examination report came to the company incomplete. The company did not inquire about the ability of the decedent to work. Moreover, it did not request or examine the x-rays which would have shown a cardiovascular condition.

Here, it is not significant that the doctor was negligent, or that the company did not use its own doctor for the examination. The duty that arises from the pre-employment examination policy is non-delegable, and the company can be held liable for the doctor's negligence. *Isgett v. Seaboard Coast Line R. Co., supra.* Moreover, in Jones Act cases, only the "slightest" evidence of negligence need be shown to reach the jury. *Perry v. Morgan Guarantee Trust,* 528 F.2d 1378 (5th Cir.1976).

The facts of this case meet the minimal test for reaching the jury on the issue as to whether the defendant negligently carried out its duty, albeit, a self-imposed one, to examine and certify the employee for work.

### The Causal Connection

A finding that there is a jury issue on the issue of negligence, however, does not end the inquiry. In order to make out a claim, the plaintiff must show a causal connection between the negligent act and the resultant death. *Rogers v. Missouri Pacific Railway Company,* 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).

In *Rogers,* the Supreme Court made clear that Congress intended a minimal showing on causation to reach the jury. The normal tort "proximate cause" notion was strictly rejected by Congress. Rather, the test as to whether a Jones Act case goes to the jury is:

> whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.

352 U.S. at 506, 77 S.Ct. at 448. The proof can be entirely circumstantial, and the fact that the jury may also, with reason, attribute the death to other causes, including contributory negligence, does not bar the case from the jury. *Id.* at page 508, 77 S.Ct. at page 449.

Here, reasonable persons could differ as to whether the negligence in failing to discover decedent's condition played even the slightest part in his death. Though not stressful, his job required that he be away from medical care, work long hours and under non-normal conditions. Had he or the company known of the condition, there might have been medical help on board and he might have sought it rather than returning to his bunk. Moreover, had he or the company known of the condition, he may not have gone to work. While I would not say that the evidence is such that the plaintiff *should prevail,* I firmly believe that there is some evidence—enough to pass the minimal requirements of the Jones Act to reach the jury.

I would vacate the directed verdict and remand the case to permit the plaintiff to put her case before the jury.